George M. Zeagler v. Commissioner.
Zeagler v. Commissioner
Docket Nos. 53410, 55075.
United States Tax Court
T.C. Memo 1958-93; 1958 Tax Ct. Memo LEXIS 136; 17 T.C.M. (CCH) 454; T.C.M. (RIA) 58093; May 23, 1958
William T. Rogers, Esq., Florida National Bank Building, Jacksonville, Fla., and John W. Donahoo, Esq., for the petitioner. Lee C. Smith, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income taxes in these consolidated cases as follows: 1947
$14,787.34
1948
11,267.44
1949
14,432.14
1950
16,279.06
1951
25,761.21
The two questions presented for our decision are whether the losses claimed by the petitioner from the operation of two farms are losses incurred in the operation of a trade or business and are deductible expenses in the years 1947 to 1951, inclusive, and whether the petitioner is entitled to a deduction as a business expense of any portion of the expenditures *137 connected with the operation and maintenance of his personal airplane and hangar, and depreciation connected therewith, in excess of the amounts allowed by the respondent. Findings of Fact Some of the facts have been stipulated by the parties. This stipulation and the exhibits annexed thereto are incorporated by this reference. The petitioner was a practicing physician residing in Palatka, Putnam County, Florida, during the taxable years, and also the owner and operator of the Glendale Hospital, hereinafter referred to as the hospital. His Federal income tax returns for the taxable years were filed with the collector of internal revenue for the district of Florida. In 1937 the petitioner purchased 10 acres of land and an old farmhouse near Satsuma, Florida, in order that his elderly parents, who had theretofore lived on a farm in Georgia, might live close to Palatka for the remainder of their lives. After a very short time his parents decided they preferred Georgia to Florida and returned to the Georgia farm. Thereafter, petitioner purchased other adjoining lands near Satsuma as follows: 1939
60.95 acres
1946
130 acres
1951
18.9 acres These 219.85 acres, *138 together with the improvements thereon, constitute a farm sometimes referred to herein as the "Florida Farm," which is one of the two farms involved in these cases. Petitioner called it the "Flying Z Ranch." In 1938 petitioner acquired the fee simple title subject to an outstanding mortgage and a life estate in his father to a 756-acre farm in Screven County, Georgia, which had been owned by his father and had been the family homestead. The petitioner was born on this farm and lived there until he had completed his college education. His father died in December 1939. The mortgage upon this farm was paid by the petitioner in 1942. Subsequently, petitioner purchased additional adjacent acreage as follows: 1943
101.75 acres
1945
250 acres This total acreage of 1,107.75 acres with the improvements thereon is sometimes referred to herein as the "Georgia Farm" and is the other of the two farms involved in these cases. After the acquisition of the Florida farm the citrus trees thereon were pruned and the grove replanted where needed. As additional acreage was acquired the number of acres planted in citrus trees increased from 3 or 4 to 15 acres. Also, a general land *139 improvement program was undertaken. During the taxable years there were approximately 150 acres of the Florida farm in improved pastures, and the petitioner grazed approximately 60 to 70 head of cattle thereon. The petitioner gained recognition as one of the pioneer developers of hairy indigo pastures on the generally poor soil. He acquired milking cows for the Florida farm from which he supplied milk, cream, and butter to his hospital until 1956. In connection with this dairy herd, the petitioner complied with certain sanitary requirements at the request of the State authorities such as painting certain fences around the dairy barn white and adding special facilities. Also, as poultry was added to the farm, modern chicken pens and houses were built. A barn and other farm buildings were built for the storage of cattle and poultry feed. During the taxable years three or more full-time workmen were employed on the Florida farm and part-time help was hired from time to time as needed. The petitioner utilized the advice and assistance of the county farm agents, Federal soil conservationists, feed and seed experts, and, in addition, gave that amount of personal attention to the operation *140 of the farm which his medical practice would permit. The hospital, which had a daily average of approximately 20 patients, was supplied with milk, butter, eggs, poultry, beef, fruit, and vegetables produced on the Florida farm during most of the taxable years. Books and records were kept on the amount of these products supplied to the hospital, but there was not a breakdown as to the individual products. Instead, one separate account was kept for the farm. Some of the surplus produce which was not needed by the hospital was sold commercially. The house on the Florida farm, in which the farm manager and his family resided, was an old building containing a dining room, small kitchen, living room, three bedrooms, and a front and a back porch. Most of the furniture in the house was owned by the farm manager but the house also contained a few pieces of furniture not belonging to the manager which had been discarded by the petitioner either from his home or from the hospital. The kitchen in this dwelling was modern in the sense that it included a stove and a sink. The petitioner retained one of the small bedrooms in this dwelling for his own personal use, but as he devoted most of his *141 time to his medical practice he was not able to be at the farm except for occasional visits, usually of short duration. The petitioner maintained a small boathouse, dock, and rowboat on the St. Johns River at the farm. He had another boat, described only as a type of speedboat, which was usually kept at the hospital. There was an outdoor fireplace on the farm and several riding horses were kept there principally for use in connection with the cattle. The Florida farm was not used to any material extent for social or recreational purposes either by the petitioner or his friends, although on several occasions he entertained fellow members of the "Flying Farmers of America." The farm did provide the petitioner with a place for occasional relaxation and change from his strenuous medical practice. The Georgia farm was in a badly rundown condition when petitioner first acquired it and a general improvement program was undertaken. Soil-building crops were planted to build up the depleted soil, and the land was terraced to stop the loss of topsoil from erosion. Barns and other farm buildings were repaired or rebuilt. A herd of scrub cattle which petitioner acquired with the farm was gradually *142 replaced with better grade cattle. At first petitioner tried Brahman cattle but this breed proving unsatisfactory he began to build up a herd of Herford cattle. During the years involved the taxpayer had a herd of as many as 200 cattle on the Georgia farm. At the suggestion of and under the direct supervision of Federal soil conservationists, improved pastures were planted so that ample feed would be available for the cattle. Various crops were raised from year to year in an effort to make money. Feed raised on the farm and not needed to feed the livestock was, at times, taken to the Florida farm to feed the cattle there. During the taxable years there were as many as 6 full-time employees on this farm. A full-time manager was employed on a fixed monthly salary basis plus 25 per cent of the farm profits. The petitioner relied upon the advice and services of the county farm agents, soil conservationists, and other farm experts in connection with the operation of the Georgia farm, and the farm manager was instructed to work with these men at all times. The Georgia farm had a remodeled 2-story residence which was the petitioner's family homestead, as well as barns, silos, tenant homes, *143 and other buildings. The farmhouse was old, ordinary, and made of rough pine lumber. The furniture was also old and was that which had belonged to the petitioner's mother and father. Petitioner made no improvements or additions to the house after he acquired it other than to paint it and to make minor repairs. During the taxable years this house was occupied by the petitioner's mother. After her death in 1951 it was occupied by the farm manager and his family. During all the years involved petitioner owned an airplane which he used principally for business trips in connection with his medical practice and farming operations. The plane was used in making consultation calls in Orlando, Tampa, De Land, and various other Florida cities. He also made several trips per month to the Georgia farm, where a landing strip had been constructed, and flew to monthly meetings of the farmers' organizations and medical conventions. The airplane bore a sign advertising the Florida farm and the Hereford cattle. Both the petitioner and his wife were licensed pilots and both operated and used the plane. The petitioner maintained a membership in such farm organizations as the Flying Farmers of America, *144 Florida Cattlemen's Association, and Georgia Cattlemen's Association. He also subscribed to various farm magazines. Signs on his farm trucks bore the names of the Florida and Georgia farms. Separate books of account and separate bank accounts were kept for the Georgia and Florida farms. The books were maintained by the hospital bookkeeper from information sent to her by the farm managers. The books did not reflect itemized details of expenses or the produce sold in connection with the farms, but only reflected monthly totals taken from daily reports submitted. Under normal conditions it takes as many as 10 to 15 years in order for a cattle operation to ripen into a profitable business. Commencing with the fall of 1951 there was a considerable drop in the cattle market and depressed conditions continued through 1956. The reported gross receipts and expenses from the operation of the Florida farm during the years involved were as follows: Year
Gross receipts
Expenses
1947
$ 3,049.40
$ 18,114.73
1948
4,556.88
27,264.89
1949
6,616.14
24,554.65
1950
8,020.70
34,843.00
1951
13,921.50
46,132.07
$36,164.62
$150,909.34
The reported gross receipts *145 and expenses from the operation of the Georgia farm during the years involved were as follows: Year
Gross receipts
Expenses
1947
$ 9,179.35
$ 19,378.41
1948
5,128.63
19,181.40
1949
2,800.21
18,735.25
1950
7,046.47
21,708.01
1951
4,546.42
21,007.28
$28,701.08
$100,010.35
The petitioner claimed losses from the operation of the Florida farm (Flying Z Ranch) owned by him on Federal income tax returns for the years 1937 to 1955, inclusive, as follows: Net loss claimed
Year
on return
1937
$ 1,617.80
1938
1,795.74
1939
2,102.88
1940
3,106.28
1941
2,930.16
1942
2,987.83
1943
$ 3,387.18
1944
3,581.91
1945
5,975.99
1946
10,161.94
1947
15,065.33
1948
22,708.01
1949
17,938.51
1950
26,822.30
1951
32,210.77
1952
36,180.79
1953
24,374.64
1954
25,532.94
1955
17,919.23
The petitioner claimed losses from the operation of the Georgia farm owned by him on Federal income tax returns for the years 1938 to 1955, inclusive, as follows: Net loss claimed
Year
on return
1938
$ 532.08
1939
4,683.96
1940
1,595.62
1941
5,108.74
1942
5,776.31
1943
5,135.44
1944
9,953.01
1945
5,510.11
1946
13,030.83
1947
10,199.06
1948
14,052.77
1949
15,935.04
1950
14,661.54
1951
16,314.59
1952
29,177.98
1953
14,963.05
1954
6,654.65
1955
22,350.64
*146 The following is a schedule of gross income of petitioner from the practice of his medical profession and operation of the Glendale Hospital for the years 1937 to 1942, inclusive, 1944, and 1946 to 1955, inclusive: Year
Professional income
1937
$50,724.60 [1]
1938
47,640.86 [1]
1939
45,548.41 [1]
1940
54,306.94 [1]
1941
18,481.64
1942
16,706.30
1944
33,017.17
1946
36,763.08
1947
36,048.66
1948
40,304.78
1949
45,777.56
1950
50,462.64
1951
67,238.43
1952
74,017.91
1953
59,081.70
1954
54,993.35
1955
72,811.43
The respondent determined that each of the farms in question was operated by the petitioner as a hobby and not with the intent to make a profit, and that, therefore, farm losses incurred for each of the taxable years were not allowable for tax purposes. On his income tax returns for the years involved the petitioner claimed a deduction for 50 per cent of the depreciation and operating expenses of the airplane and hangar. The respondent determined that only 10 per cent of the *147 expenses and depreciation constituted allowable deductions. Petitioner had a true intention of eventually making a profit from the operation of the farms here in question. Their operation during the taxable years constituted a trade or business carried on by petitioner. Opinion KERN, Judge: The principal question for our decision is whether during the taxable years the petitioner was engaged in farming as a business with the intent of making a profit, or whether he was engaged in farming as a hobby. Stated in the words of Regulations 111, section 29.23(e)-5, the issue is whether petitioner's farms were operated "as business enterprises" or were "operated for recreation or pleasure." The petitioner claims that he was in the business of farming and that losses incurred in each of the taxable years in the farming business are therefore proper tax deductions. The respondent contends that farming was a hobby for the petitioner and that he "operated the farms in question with an intention to make a profit from his income tax returns rather than from his farming operations," and "[for] twenty years he has minimized his taxes owed the Government and in so doing has created an estate *148 at Government expense." Another issue for our decision is whether the petitioner is entitled to a deduction as a business expense of any portion of the expenditures connected with the operation and maintenance of his personal airplane and hangar in excess of the amounts allowed by respondent. The respondent allowed only a small portion of these expenditures as incurred in connection with the taxpayer's medical profession. With the exception of the continuous and considerable losses incurred by petitioner over many years in the operation of the farms here in question, all of the facts shown of record substantiate petitioner's repeated and categorical testimony that he intended to obtain a profit from the operation of these farms, and that he had a reasonable expecation of making a profit after a development period of 10 to 15 years even though temporarily disappointed by reason of the depression in the cattle business beginning in 1951. Also the absence from the record of certain facts substantiates petitioner's testimony. By way of example, in this case the farms were not country estates used by petitioner as residences, they were not "showplaces," and they were not used to any material *149 extent for entertaining or recreation, nor were they equipped for such purposes. The fact that there has been a long series of losses in the operation of these farms, while undoubtedly a material factor for our consideration in the instant cases, "is not controlling if the other evidence shows there is a true intention of eventually making a profit." . See also ; . Since "the other evidence" in these cases indicates in our opinion that petitioner had "a true intention of eventually making a profit" from the operation of these farms, we have decided the principal issue here involved in favor of petitioner. With regard to the issue having to do with the disallowance of a part of the deductions claimed by petitioner on account of expenditures in connection with his airplane and hangar, and of their depreciation, it may well be, as petitioner suggests, that respondent's determination was to some extent predicated on his view (held herein to have been erroneous) that petitioner's farming activities were not businesses and that, accordingly, expenditures *150 incident to the use of the airplane in connection with the farming activities were not deductible business expenses. However, the burden of proving error in connection with this determination is, of course, on petitioner. He has proved that his own use of the airplane for business purposes was greater than his own use of the airplane for pleasure. However, the record shows that during the taxable years petitioner's wife, who had a pilot's license, "used [the airplane] some." There was no other testimony with regard to the use of the airplane by petitioner's wife. Upon the record before us, we are unable to conclude that petitioner has proved error in respondent's determination on this issue. Decisions will be entered under Rule 50. Footnotes
1. These figures represent gross professional income. All other figures represent net professional income. The 1943 and 1945 returns are not available.↩